UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:16-23039-CIV-AOR
[Consent Case]

LEONEL ROMELI MIX DONIS, and all
others similarly situated under 29 U.S.C.
216(b)

       Plaintiff,

v.

A&A AUTO PRIDE, L.L.C., d/b/a
SUNNY ISLES MOBIL, ALEXANDER
AYZEN, DAGOBERTO FREITAS

       Defendants.

_____/

## DEFENDANTS, A & A AUTO PRIDE, LLC AND ALEXANDER AYZEN'S, MOTION FOR SANCTIONS PURSUANT TO RULE 11

Defendants, A & A AUTO PRIDE, LLC and ALEXANDER AYZEN, by and through their undersigned counsel, file this Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 against the Plaintiff and his counsel, and as grounds therefore, state as follows:

## INTRODUCTION

On July 13, 2016, Plaintiff filed this lawsuit against the Defendant, A & A Auto Pride, LLC ("Auto Pride") its owner, Alexander Ayzen ("Ayzen"), and one other individual seeking unpaid overtime wages under 29 U.S.C. § 207 and unpaid minimum wages under 29 U.S.C. § 206 (a)(1)(A). [D.E. 1]. Specifically, Plaintiff alleged that he was employed by the Defendant, A & A, and that A & A's principal, Alexander Ayzen, "was responsible for paying Plaintiff's wages for the relevant time period and controlled Plaintiff's work schedule… ." [D.E. 1 at ¶ ¶ 3 and 4.) On May 8, 2017, Plaintiff filed his First Amended Complaint which included the same allegations. [D.E. 35].

These allegations are untrue and frivolous.  Indeed, Plaintiff and his attorneys are fully aware that Plaintiff was never employed by A & A and that Ayzen lacked any control over the operations of the car wash wherein Plaintiff worked.  Rather, Plaintiff was at all times working directly for Defendant, Dagoberto Freitas, who is the owner of the car wash.[1]  Significantly, Plaintiff has unequivocally admitted these facts in his deposition.  Despite the foregoing, Plaintiff and his lawyers, in bad faith, have refused to acknowledge that their allegations against A & A and Ayzen are false and continue to pursue this claim.

Because the Plaintiff and his lawyers knowingly continue to frivolously assert these claims against A & A Auto Pride and Ayzen, sanctions pursuant to Rule 11 are warranted against Plaintiff and his counsel.

**<u>Factual Background</u>**

1.      On July 13, 2016, Plaintiff filed this lawsuit against the Defendant, A & A Auto Pride, LLC ("Auto Pride") its owner, Alexander Ayzen ("Ayzen"), and one other individual seeking unpaid overtime wages under 29 U.S.C. § 207 and unpaid minimum wages under 29 U.S.C. § 206 (a)(1)(A).  [D.E. 1].   Specifically, Plaintiff alleged that he was employed by the Defendant, A & A, and that A & A's principal, Alexander Ayzen, "was responsible for paying Plaintiff's wages for the relevant time period and controlled Plaintiff's work schedule… ." [D.E. 1 at ¶ ¶ 3 and 4.)

2.      On November 17, 2016, a clerk's default was entered against A & A Auto Pride. [D.E. 15].

3.      On December 12, 2016, A & A Auto Pride moved to vacate the clerk's default. [D.E. 19].   Attached to that motion was the Affidavit of Alexander Ayzen.   In his affidavit, Mr.

---

[1]  Defendants do not take a position as to whether Plaintiff was working as an employee or independent contractor for Freitas or whether any other relevant threshold has been met with respect to Plaintiff's claim against Freitas.

Ayzen explained that Plaintiff had worked as a car washer for Defendant, Freitas. *Id.* Ayzen further explained that Freitas operated the car wash under a lease arrangement with A & A Auto Pride and that Freitas was fully responsible for all of the car wash activities, including the hiring and firing of workers and their wages. *Id.*

4. On December 13, 2016, this Court granted A & A Auto Pride's Motion to Vacate. [D.E. 20].

5. On March 30, 2017, Plaintiff was deposed. In his deposition, Plaintiff admitted:

   a. Freitas hired him in October 2008. *See* Exhibit "A" at 9:23-25.

   b. Freitas set the schedule for the workers. *Id.* at 11:8-10.

   c. Freitas and his son were the only ones in charge of customer intake. *Id.* at 13:1-6.

   d. Freitas would pay rent to A & A Auto Pride for use of the space. *Id.* at 20:14-22 *and* 22:9-12.

   e. Freitas fired Plaintiff. *Id.* at 22:2-3.

   f. Ayzen never fired any worker at the car wash. *Id.* at 38:20-22

   g. Ayzen did not have the authority to fire Plaintiff. *Id.* at 43:19-21.

   h. Ayzen did not pay Plaintiff. *Id.* at 22:4-5.

   i. Freitas would determine how much Plaintiff would receive at the conclusion of each day. *Id.* at 38:23-39:1.

   j. Plaintiff would report to Freitas upon arrival. *Id.* at 23:6-11.

   k. Plaintiff worked for Freitas. *Id.* at 43:19-21.

6. On July 17, 2017, Plaintiff deposed Freitas and Ayzen. At that deposition, each of the facts that Plaintiff admitted in his deposition, and as set forth above, were corroborated.

7. Notwithstanding, Plaintiff persists in his desire to pursue this matter against A & A Auto Pride and Ayzen.

## MEMORANDUM OF LAW

Rule 11 of the Federal Rules of Civil Procedure seeks to strike a careful balance. Its object is to reduce frivolous claims, defenses, or motions, and...deter costly meritless maneuvers." *Kaplan v. DaimlerChrysler, A.G.,* 331 F.3d 1251, 1255 (11th Cir. 2003) (quoting *Massengale v. Ray.* 267 F.3d 1298, 1302 (11th Cir. 2001)).

Rule 11 has two separate prongs: first that a pleading, written motion, or other paper not be presented for any improper purpose and second, that it be well-grounded in fact and law. Fed. R. Civ. P. (a)-(b). In general, the circuits have adhered to the plain text of Rule 11 and held that an attorney or party may be sanctioned under the improper purpose clause even if the paper he or she presents is otherwise non-frivolous. *See Whitehead v. Food Max of Miss.,* 332 F.3d 796, 805 (5th Cir. 2003); *Senese v. Chi.Area l.B. of T. Pension Fund,* 237 F.3d 819, 826 (7th Cir. 2001); *Cohen v. Va. Elec. & Power Co., 788 F.2d 247, 249 (4th Cir. 1986).*

Rule 11 provides that by presenting to the court a pleading, written motion, or other paper, an attorney or a pro se litigant represents that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> a.   It is not being presented for any improper purpose, such as to harass, cause unnecessary  delay, or needlessly increase the cost  of litigation;
>
> b.   The claims, defenses, and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> c.   The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> d.   The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

"When the court is considering sanctions on a factual claim, 'the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings or at trial.'" *Edmonds v. Gillmore,* 988 F. Supp. 948, 957 (E.D. Va. 1997) (citing *Calloway v. Marvel Entm't Grp.,* 854 F.2d 1452, 1470 (2d Cir. 1988)).

Under Rule 11, a complaint containing allegations unsupported by any information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to Rule 11 sanctions. *Baker v. Booz Allen Hamilton, Inc.,* 358 Fed. Appx. 476, 483-484 (4th Cir. 2009). Thus, to be reasonable, the pre-filing factual investigation must uncover some information to support the allegations in the complaint. *Brubaker,* 943 F.2d at 1373.

In the instant case, Rule 11 sanctions are appropriate as Plaintiff has frivolously asserted that A & A Auto Pride employed him as a car washer. "To establish a prima facie case for failure to pay overtime compensation and/or minimum wages under FLSA, an employee must demonstrate: (1) **an employment relationship**, (2) that the employer engaged in interstate commerce, and (3) that the employee worked over forty hours per week but was not paid overtime wages." *Freeman v. Key Largo Volunteer Fire & Rescue Dept*., Inc., 841 F. Supp. 2d 1274, 1277 (S.D. Fla. 2012), *aff'd,* 494 Fed. Appx. 940 (11th Cir. 2012)(emphasis added).

> Under the FLSA, an "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency ..." 29 U.S.C. § 203(d). To "employ" is defined as to "suffer or permit to work." 29 U.S.C. § 203(g). The determination of whether Plaintiff is an employee or a volunteer under FLSA is a question of law, *Patel v. Wargo*, 803 F.2d 632, 634 n. 1 (11th Cir.1986) (*citing Weisel v. Singapore Joint Venture, Inc*., 602 F.2d 1185, 1189 n. 11 (5th Cir.1979)), and individuals seeking compensation pursuant to the FLSA "bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of

the Act." *Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 427 (4th Cir.2011).

When analyzing whether an individual is an employee under the FLSA, the Supreme Court has held that courts should consider the FLSA's terms in light of the "economic reality" of the relationship between the parties. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 936–37, 6 L.Ed.2d 100 (1961). The economic reality test inquiries into whether the alleged employer:

(1) had the power to hire and fire the employees;
(2) supervised and controlled employee work schedules or conditions of employment;
(3) determined the rate and method of payment; and
(4) maintained employment records.

*Id.* at 1278.  Here, it is undisputed that A & A Auto Pride (i) did not hire or fire Plaintiff, (ii) did not supervise or control Plaintiff's work, (iii) did not pay Plaintiff, (iv) does not have any employment records.  Plaintiff also recognizes that he "worked for [Freitas]."  *See* Exhibit "A," at 43:19-22. Because A & A Auto Pride did not have any employment relationship with Plaintiff, his claims for unpaid wages fail as a matter of law.

The Rule 11 "Safe Harbor" Prerequisite to Filing requires the party seeking sanctions to serve the Rule 11 motion on the opposing party at least twenty-one (21) days before filing the motion with the district court. Sanctions may be sought only if the challenged pleading is not withdrawn or corrected within twenty-one days after service of the motion. Fed. R. Civ. P. 1l(c)(2).  Defendants will not file this motion for at least twenty days after service on Plaintiff's counsel.

## **CONCLUSION**

For the foregoing reasons, Defendant A & A AUTO PRIDE, LLC and ALEXANDER AYZEN respectfully requests that this Court enter an Order finding that Plaintiff and his counsel have violated Rule 11 and that sanctions are warranted inc1uding but not limited to the dismissal of the instant action with prejudice, an award of attorneys' fees and costs, apportioned between

Plaintiff and its counsel, and for such other relief as this Court deems just and proper.

Respectfully submitted,

HALL, LAMB HALL & LETO, P.A.
*Attorneys for A & A Auto Pride and Ayzen*
Offices at Grand Bay Plaza
Penthouse One
2665 South Bayshore Drive
Miami, Florida 33133
Telephone: (305) 374-5030
Facsimile:   (305) 374-5033
mleto@hlhlawfirm.com


By: ___/s Matthew P. Leto___
         MATTHEW P. LETO
         FBN: 014504

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the forgoing was served

electronically on all counsel of record this 24th day of July, 2017:

Rivkah Jaff
J.H. Zidell P.A.
300 71st Street, Suite 605
Miami Beach, FL 33141
rivkah.jaff@gmail.com

Neil Tobak
J.H. Zidell P.A.
300 71st Street, Suite 605
Miami Beach, FL 33141
ntobak.zidellpa@gmail.com

Andres Fernandez
Samantha Fraga-Lopez
Berens Fernandez
2100 Ponce De Leon Blvd.
PH 2
Coral Gables, FL 33134
fraga@berensfernandez.com
Fernandez@berensfernandez.com
yumai@berensfernandez.com

                 _/s_ Matthew P. Leto
                 MATTHEW P. LETO

Leonel Donis
March 30, 2017

```
 1        IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
          CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2
                  CASE NO: 1:16-23039 CIV SCOLA
 3

 4


 5
      LEONAL ROMELI MIX DONIS, and
 6    all others similarly situated
      under 29 U.S.C. 216(b),
 7
                            Plaintiff,
 8    v.

 9    A&A AUTO PRIDE, L.L.C., d/b/a
      SUNNY ISLES MOBIL, ALEXANDER
10    AYZEN, and DAGOBERTO FREITAS,

11                          Defendants,

12
      _____/
13

14            DEPOSITION OF LEONEL DONIS
            VOLUME 1 of 1, Pages 1 through 45
15

16

17

                   Thursday, March 30, 2017
18                 1:00 p.m. to 2:20 p.m.
                   2665 South Bayshore Drive
19                   Miami, Florida 33133

20
             (Stenographically) Reported by:
21             Adriadna Gonzalez-Rivas
              Florida Professional Reporter
22

23

24                    ┌─────────────┐
                      │   EXHIBIT   │
25                    ├─────────────┤
                      │      A      │
                      └─────────────┘
```

## Page 2

```
 1
                    APPEARANCES
 2
 3   On Behalf of the Plaintiff:
 4   J.H. ZIDELL, P.A.
     300 71st Street
 5   Suite 605
     Miami Beach, Florida 33141
 6   ntobak.zidellpa@gmail.com
     BY:  NEIL TOBAK, ESQ.
 7
 8
     On Behalf of the Defendant:
 9
     HALL, LAMB, HALL & LETO, P.A.
10   2665 South Bayshore Drive
     Penthouse One
11   Miami, Florida 33133
     mleto@hlhlawfirm.com
12   BY:  MATTHEW P. LETO, ESQ.
13
14              INDEX OF PROCEEDINGS
15
     DEPOSITION OF LEONEL DONIS        Page
16
     Direct Examination by Mr. Leto      3
17   Cross Examination by Mr. Tobak     39
     Redirect Examination by Mr. Leto   41
18   Certificate of Oath                44
     Certificate of Reporter            45
19
20
21              EXHIBITS
22   Number    Description           Page
23    1        2013 Income Tax Return   29
24
25
```

## Page 3

```
 1         Deposition taken before Adriadna
 2   Gonzalez-Rivas, Florida Professional Reporter and
 3   Notary Public in and for the State of Florida at
 4   Large in the above cause.
 5              ------
 6         (Thereupon, Fiorella Warger, Spanish
 7   Interpreter, was sworn in by the court
 8   reporter.)
 9         THE COURT REPORTER:  Do you swear the
10   testimony you are about to give will be the truth,
11   the whole truth, and nothing but the truth?
12         THE WITNESS:  I do.
13   THEREUPON,
14              LEONEL DONIS,
15   Having been first duly sworn, was examined and
16   testified as follows:
17            DIRECT EXAMINATION
18   BY MR. LETO:
19      Q.   Good afternoon, sir.
20      A.   Yes, good afternoon.
21      Q.   Can you state your name for the record?
22      A.   Leonel Romeli Mix Donis.
23      Q.   My name is Matthew Leto, I represent
24   A&A Auto Pride, LLC, the company that you filed a
25   lawsuit against, and I am going to take your
```

## Page 4

```
 1   deposition today.
 2         Have you ever given a deposition
 3   before?
 4      A.   No.
 5      Q.   Let me go over a couple of ground rules
 6   to make this as easy as possible.  I am going to ask
 7   you a series of questions related to your claim and
 8   I am going to allow you to give me a full answer to
 9   those questions.
10         If there are any problems that you have
11   with the question, meaning you don't understand what
12   I am asking you, please ask me to rephrase it and I
13   will be happy to do so.
14      A.   Okay.
15      Q.   Otherwise, I am going to assume that
16   you understood the question fully and provided me
17   with a truthful answer.
18      A.   Okay.
19      Q.   If the question requires a yes or no
20   answer, please answer verbally say yes or no rare
21   than shaking your head or nodding your head, that
22   will just allow us to get a clear record today.
23   Okay?
24      A.   Okay.
25      Q.   If you need a break at any time just
```

## Page 5

```
 1   let me know and we can take five minutes if you
 2   want, this is not a jail.
 3         What is your date of birth?
 4      A.   3/4/84.
 5      Q.   Where were you born?
 6      A.   Guatemala.
 7      Q.   When did you come to the United States?
 8      A.   2008.
 9      Q.   Are you a United States citizen?
10      A.   No.
11      Q.   Do you have a Visa to work in the
12   United States?
13      A.   No.
14      Q.   Are you here illegally?
15      A.   Yes.
16      Q.   Where do you currently live, sir?
17      A.   Miami.
18      Q.   What is your address, full address,
19   please?
20      A.   169 Northwest 33rd Street.
21      Q.   How long have you lived in that
22   address?
23      A.   Eight years, the same time that I have
24   been here.
25      Q.   Is that the only addressed that you
```

Leonel Posd
March 30, 2017                                    6 to 9

Page 6

1    have only lived in since coming to the United
2    States?
3         A.    Yes.
4         Q.    Who do you live at that address with
5    currently?
6         A.    With my brother, my family.
7         Q.    What is your brother's name?
8         A.    Minor Anthony Mix Donis.
9         Q.    How old is?
10        A.    He is 40.
11        Q.    What does he do for a living?
12        A.    Remodeling.
13        Q.    Interior home remodeling?
14        A.    Yes.
15        Q.    Has he done that since coming to the
16   United States?
17        A.    Yes.
18        Q.    Who does he work for?
19        A.    On his own.
20        Q.    Does he work for any particular company
21   more often than not?
22        A.    Yes.
23        Q.    What company?
24        A.    No, I don't remember.
25        Q.    Did you come to the United States with

Page 7

1    your brother?
2         A.    Yes.
3         Q.    And you also live with who else?
4         A.    With my family.
5         Q.    Who else in your family?
6         A.    Lilian, Maria Del Carmen, Alvaro Rene
7    Carigas,  Yamilet Mix.
8         Q.    What is Liliana's relationship to you?
9         A.    My sister.
10        Q.    How old is your sister?
11        A.    She is older than me, I don't remember.
12        Q.    Have you ever worked with your brother
13   doing remodeling?
14        A.    No.
15        Q.    Do you know what your sister does for a
16   living?
17        A.    My sister?
18        Q.    Yes.
19        A.    Restaurant.
20        Q.    Have you ever worked with her before?
21        A.    No.
22        Q.    Maria Del Carmen, what is her
23   relationship to you?
24        A.    My sister.
25        Q.    Is she your older sister or younger

Page 8

1    sister?
2         A.    She is younger, she is about 24, she is
3    younger than all of us.
4         Q.    What does she do for a living?
5         A.    Restaurant.
6         Q.    Have you ever worked with her before?
7         A.    No.
8         Q.    Alvaro, what's your relationship to
9    Alvaro?
10        A.    My brother-in-law.
11        Q.    He is married to which sister?
12        A.    Lilian.
13        Q.    Have you ever worked with Alvaro
14   before?
15        A.    No.
16        Q.    Yamilet, what is the relationship to
17   Yamilet?
18        A.    My niece.
19        Q.    Is Yamilet the daughter of one of the
20   people that you just told me before about?
21        A.    Yes, my sister, but she doesn't live
22   with me.
23        Q.    How old is your niece?
24        A.    She is about 23 years old.
25        Q.    Have all of those people lived at 169

Page 9

1    Northwest 33rd Street address since you moved to the
2    United States in 2008?
3         A.    I came before, they came later.
4         Q.    You were the first one?
5         A.    Antonio and I.
6         Q.    What's your highest level of education,
7    sir?
8         A.    It was not here.
9         Q.    In Guatemala what was your highest
10   level of education there?
11        A.    Sixth.
12        Q.    So when you came to the United States
13   what did you first do for employment?
14        A.    Car wash.
15        Q.    Where?
16        A.    Sunny Isles Mobil.
17        Q.    Is that the same Sunny Isles Mobile
18   that you are suing in this case?
19        A.    Yes.
20        Q.    When did you begin working at that
21   mobile station?
22        A.    October of 2008.
23        Q.    Were you hired by Mr. Freitas in
24   October of 2008?
25        A.    Yes.

Page 10

1      Q.   How did you meet Mr. Freitas?
2      A.   Through a friend.
3      Q.   Which friend?
4      A.   His name is Jose Sandoval.
5      Q.   Does Mr. Sandoval also work at the car
6  wash?
7      A.   We work together.
8      Q.   Did he work there the entire time that
9  you worked there?
10     A.   Yes.
11     Q.   Do you know where Mr. Sandoval lives?
12     A.   I don't have the address, but I do have
13 the phone number.
14     Q.   How did you each day get to work at the
15 mobile station, do you have a car?
16     A.   No, in bus.
17     Q.   How long was that bus trip?
18     A.   An hour and-a-half, and it's two
19 busses.
20     Q.   How early would you leave in the
21 morning to get to work on time?
22     A.   Six.
23     Q.   6:00 a.m.?
24     A.   Yes.
25     Q.   What time did the car wash open?

Page 11

1      A.   8:00 a.m.
2      Q.   What time did it close each day?
3      A.   Eight, 9:00 p.m..
4      Q.   So between 8:00 a.m., eight or 9:00
5  p.m. each day that you worked there you were washing
6  cars?
7      A.   Yes.
8      Q.   Would Mr. Freitas set the schedule for
9  each of the workers to be there, correct?
10     A.   Yes.
11     Q.   When you first spoke to Mr. Freitas
12 about the position to work there, how was the
13 compensation that you discussed?
14     A.   Compensation?  It's my production.
15     Q.   Explain to me what Mr. Freitas told you
16 as to how you would be paid?
17     A.   We didn't have a fixed salary, it
18 varied from day-to-day.
19     Q.   But how did you know what you earned on
20 a daily basis, was it per car, was it based upon the
21 total amount received?
22     A.   Yes.
23     Q.   Per car?
24     A.   Yes.
25     Q.   If you worked on ten cars per day you

Page 12

1  received a portion of what each vehicle would cost?
2      A.   Yes.
3      Q.   What exactly were your job duties
4  throughout the entire time that you worked at that
5  particular car wash?
6      A.   I would wash cars, I would do the
7  interior, I would make them shine, polish them.
8      Q.   So washed the interior and exterior of
9  the vehicles depending on what the customers asked
10 for?
11     A.   Exactly.
12     Q.   When a car goes to that particular car
13 wash, who do they speak to about what they want from
14 a particular car wash?
15     A.   With the son's of Dagoberto.
16     Q.   What is the sons names?
17     A.   Danilo Freitas, Dagoberto Junior.
18     Q.   So those two individuals were
19 essentially the point people who did the intake for
20 the customers?
21     A.   Yes.
22     Q.   Did anybody else perform that function
23 at all during the time that you worked there?
24     A.   No.  At first only Danilo, but then
25 both.

Page 13

1      Q.   So just to be clear, at the beginning
2  when you started working at the car wash Danilo
3  would be the one to do the customer intake and
4  eventually it turned to Dagoberto Junior, right?
5      A.   Yes, because he came from Brazil and
6  then they started working together.
7      Q.   Throughout the entire time that you
8  worked at the gas station in the car wash, nobody
9  else did that customer intake other than those two
10 individuals?
11     A.   Yes, just the two of them.
12     Q.   And then in turn, whoever the customer
13 spoke to initially either if it was Danilo or
14 Dagoberto, one of those two would then tell you what
15 you needed to do with respect to a particular car?
16     A.   Danilo and Dagoberto Junior, I would
17 receive my orders from them.
18     Q.   Got it.  As far as the equipment that
19 you use on a daily basis, what types of tools did
20 you use to do the car wash?
21     A.   Gloves to clean the interior and
22 chemical products.
23     Q.   Did you buy your own gloves?
24     A.   No.  We would buy them among all of us.
25     Q.   What do you mean by that?

Page 14

1      A.   Among all of the workers we would buy
2  them because they would buy them and then they would
3  deduct it from your paycheck.
4      Q.   So essentially you would share the cost
5  of gloves with the other workers that you purchased
6  on your own?
7      A.   Yes, among all of us.
8      Q.   How about the chemical products that
9  you used to do the actual car washing, who purchased
10 those products?
11     A.   He, but he would pay half and we would
12 pay the other half.
13     Q.   Who is he?
14     A.   He would pay half and all of the
15 employees would pay the other half.
16     Q.   Who is he, Dagobeto senior?
17     A.   Yes, the father.  He would buy the
18 chemical, he would pay in full and he would deduct
19 half from us.
20     Q.   And when you say us, you mean all of
21 the workers that worked there?
22     A.   All of them, yes, all of the employees.
23     Q.   How many individuals worked at the car
24 wash on any particular day, was there a set number?
25     A.   No, because we would rest, four of us,

Page 15

1  but in total we were between 17 and 20.
2      Q.   17 and 20 every single day?
3      A.   Yes, because four would rest.
4      Q.   When you say rest, what does that mean?
5      A.   The rest, a day off.  Everybody had one
6  rest.
7      Q.   When you use the term rest, so we are
8  clear, you would work six days per week rather than
9  seven?
10     A.   No, we almost didn't have days off, it
11 was a difference where they would leave some out.
12     Q.   I think I need to understand a little
13 better what you are telling me.
14          On any given week how many days did you
15 work?
16     A.   I worked seven days.  Because I worked
17 they wouldn't let me rest.
18     Q.   So then were all 17 to 20 people
19 working seven days a week at the same time?
20     A.   Not all of them.  The difference that
21 those who worked seven days worked seven days, the
22 other ones didn't.
23     Q.   So you worked seven days per week
24 between the hours of 8:00 a.m. and 6:00 p.m.?  I'm
25 sorry, 8:00 a.m. to 9:00 p.m.?

Page 16

1      A.   Yes.
2      Q.   Every single day from 2008 to 2016 when
3  you stopped working there?
4      A.   Yes.
5      Q.   You didn't have one single day off in
6  that eight year period?
7      A.   Thanksgiving, the only one.  The 25th
8  of December.  November, December, yes.
9      Q.   So you had only one or two days off
10 every single year for eight straight years?
11     A.   Exactly.
12     Q.   When was the last time that you were
13 back in Guatemala?
14     A.   I never went, I have never gone.
15     Q.   Other than working in Miami, where else
16 have you travelled to since being in the United
17 States?
18     A.   I haven't travelled.
19     Q.   What do you currently do for a living?
20     A.   Car wash.
21     Q.   Where?
22     A.   Currently?
23     Q.   Yes.
24     A.   Northeast, I work now at northeast.
25     Q.   You currently work at which car wash?

Page 17

1      A.   In the car wash Northeast.
2      Q.   Is there an address?
3      A.   Yes.  151 northeast 6th Avenue.
4      Q.   How long have you worked at that
5  location?
6      A.   Since I left, since I was fired from
7  the car wash in July of 2016.
8      Q.   Does anybody else from the Sunny Isles
9  mobile work with you now at the new car wash?
10     A.   Yes.
11     Q.   Who?
12     A.   Eddy Fernando Carias and Carias.
13     Q.   Is that the only person?
14     A.   That we work together?
15     Q.   Yes.
16     A.   Yes.
17     Q.   Did he help get you the job at the new
18 car wash?
19     A.   No.
20     Q.   Who is Brady Giovanni Rios Palencia,
21 who is that?
22     A.   We worked together in the car wash.
23     Q.   Did you ever live with him?
24     A.   Yes, we currently live together.
25     Q.   He is not a family member of yours?

Page 18

1    A.   Yes, we are family.
2    Q.   What's his relationship to you?
3    A.   He is my sister's brother-in-law.
4    Q.   Going back to Danilo and Dagoberto
5 Junior, what was their role at the car wash during
6 the entire time that you worked there?
7    A.   Customer service.
8    Q.   Did anybody else perform that function,
9 for the car wash during the time that you worked
10 there?
11    A.   On Sunday, yes.  Sundays it was Jose
12 Sandoval, that's it, Sunday.
13    Q.   Mr. Sandoval, Danilo and Dagoberto
14 Junior were the only people that told you how to
15 conduct your work on a daily basis?
16    A.   Yes, but Sandoval was there only on
17 Sunday, that's why he would receive them.
18    Q.   I want to have it clear for the record
19 that those were the only three individuals that you
20 reported to about how to do your work?
21    A.   Yes.
22    Q.   Other than washing cars and you talked
23 about doing the interiors and the polishing, what
24 other work did you do at the car wash?
25    A.   They had like a mechanic shop there so

Page 19

1 when it was not busy they would make us push cars or
2 paint.
3    Q.   When you say push cars, what does that
4 mean?
5    A.   Because when they didn't work we had to
6 move them from one place to another.
7    Q.   How often did that happen on a weekly
8 basis?
9    A.   Always.
10    Q.   Every day?
11    A.   Always, yes.
12    Q.   Always means you won't ever be washing
13 cars, so I want to be a little more clear on that
14 answer.
15    A.   Yes, exactly.
16    Q.   Did you not wash cars?
17    A.   Yes, I also washed cars.
18    Q.   So obviously you can't be pushing cars
19 always if you are washing cars?
20    A.   Yes, but when there was nothing to do
21 they would always make us push cars.
22    Q.   That's what I am trying to figure out.
23        How often would that happen that there
24 was nothing to do?
25    A.   Because when it was slow.

Page 20

1    Q.   How busy were you at that place, the
2 car wash?
3    A.   We were always busy, but there was
4 always a moment to do that.  There was always time
5 where they would pull us from there to push cars.
6    Q.   Who would pull you from there?
7    A.   Dagoberto.
8    Q.   Is he the only one that told you to
9 push cars?
10    A.   Alex also.
11    Q.   How often would Alex tell you to push
12 cars?
13    A.   Because the owner of the shop.
14    Q.   I understand that, but how often would
15 Alex tell you to do it rather than Dagoberto?
16    A.   Both, they were partners.
17    Q.   How do you know they were partners?
18    A.   Because Dagoberto would pay him the
19 rent.
20    Q.   So you are aware that Dagoberto was
21 paying him rent for use of that space as a car wash?
22    A.   Yes.
23    Q.   What were you painting?
24    A.   The area where we worked.
25    Q.   Was Dagoberto the one that told you to

Page 21

1 paint the area where you worked?
2    A.   Yes.
3    Q.   Alex didn't tell you to paint the area
4 where you worked?
5    A.   No, Dagoberto.
6    Q.   The only thing Alex ever told you to do
7 at that location was push cars from time to time?
8    A.   Exactly.
9    Q.   Alex didn't tell you to do anything
10 else with respect to the car wash?
11    A.   He would always tell us that we had to
12 do a good job, but mainly Dagoberto.
13    Q.   So Alex would walk by and say, make
14 sure that you do a good job and that's it?
15    A.   Exactly.
16    Q.   He is a friendly guy, right?
17    A.   More or less.
18    Q.   You didn't talk to him very often?
19    A.   No.
20    Q.   How often on a daily basis did you talk
21 to Alex?
22    A.   We almost didn't talk to him because he
23 would only talk to us when we needed to push cars,
24 that's it.
25    Q.   Alex didn't hire you, right?

Page 22

1     A.   Dagoberto.
2     Q.   Alex didn't fire you either, did he?
3     A.   No, Dagoberto did.
4     Q.   And Alex didn't pay you, correct?
5     A.   No, Dagoberto would.
6     Q.   And Alex, to your knowledge, is the
7  owner of the gas station?
8     A.   Yes.
9     Q.   The way that you understood it,
10 Dagoberto paid rent to have his car wash on the gas
11 station property?
12    A.   Exactly.
13    Q.   How much did you earn on a yearly basis
14 for your work at the car wash?
15    A.   I have no idea, but in a week I would
16 work 72 hours.
17    Q.   How do you know that?
18    A.   Because we worked a lot, we worked more
19 than 40 hours.
20    Q.   How do you know that you worked 72
21 hours?
22    A.   Because we all knew that we worked 72
23 hours.
24    Q.   Did you write it down anywhere each
25 day?

Page 23

1     A.   I wouldn't write it down, but in my
2  head I knew it.
3     Q.   When you came to work each day did you
4  have to sign in?
5     A.   No.
6     Q.   Who did you have to report to when you
7  arrived each day?
8     A.   Him.
9     Q.   Who is him?
10    A.   Dagoberto.  He was already there when
11 we arrived at eight.
12    Q.   Senior?
13    A.   Yes.
14    Q.   So each day he would be there before
15 you were?
16    A.   Yes.
17    Q.   And each day he would be there when you
18 left?
19    A.   Exactly.
20    Q.   I live in the area of the gas station
21 just personally and I have been there when it's been
22 raining and there has been nobody working at the car
23 wash, so am I correct that the car wash was not open
24 on rainy days?
25    A.   No.

Page 24

1     Q.   No, it wasn't open or no I am wrong?
2     A.   It is open always.
3     Q.   On the rainy days it's still open
4  according to you?
5     A.   They would keep us there until the end
6  of the day.
7     Q.   And the end of the day was what time?
8     A.   Eight or 9:00 p.m..
9     Q.   How were you paid, what percentage?
10    A.   They would pay us 40 percent.
11    Q.   40 percent of the total gross of the
12 day?
13    A.   Yes.
14    Q.   And the 40 percent would be split among
15 the people that worked on that particular day?
16    A.   Exactly.
17    Q.   Was there a tip jar as well?
18    A.   Yes, but we almost never received it.
19    Q.   Who received it?
20    A.   Danilo.
21    Q.   Danilo took the whole tip jar?
22    A.   Yes, he almost never gave us any.
23    Q.   So how much did you make on a weekly
24 basis?
25    A.   I have no idea, it varied because it

Page 25

1  was not a set salary, it was like one day you make
2  so much and another day you make so much.
3     Q.   Have you ever made an attempt to
4  calculate how much you earned in a particular day or
5  a particular week?
6     A.   No.
7     Q.   Do you keep any records of how much you
8  earned on a daily basis?
9     A.   No, never, because they paid us cash
10 every day.
11    Q.   So sitting here today you can't tell me
12 with any certainty how much you earned on a weekly
13 basis, correct?
14    A.   No.  Per hour I do know that we made
15 6.66 per hour.
16    Q.   How do you know that?
17    A.   Because we kind of calculated that we
18 made 6.66 an hour.
19    Q.   Who kind of calculating that?
20    A.   Among all of us, because we were a lot,
21 we were many.
22    Q.   I want to know who calculated the $6.66
23 hourly wage that you are telling me about?
24    A.   We all did, all of us that were fired.
25    Q.   Who is everyone?

Page 26

1      A.   Jose, Brady, Alvaro, Rene, Carias,
2  Wilber, Octavio Carias Carias, Byron, Stuart
3  Sandoval, Arnaldo Munoz, Jose Sandoval.
4      Q.   When did you all perform this
5  calculation?
6      A.   When we were fired.  They fired us at
7  different times not the same day.
8      Q.   Did you all meet and figure this out
9  together?
10     A.   Yes.
11     Q.   Where?
12     A.   At home.
13     Q.   Whose home?
14     A.   Mine.
15     Q.   After you were fired?
16     A.   Yes.
17     Q.   Did you write down the calculation?
18     A.   No, we didn't write it down we were
19 just talking.
20     Q.   You were just talking and you came up
21 with $6.66 per hour?
22     A.   Yes.
23     Q.   So how much were you earning on a
24 yearly basis or weekly?
25

Page 27

1           How much were you earning on a weekly
2  basis to come up with that number?
3      A.   Because we all did it and that's how we
4  all know that we would make that per hour.
5      Q.   But it's a different question.  My
6  question to you is, how much were you making on a
7  weekly basis that allowed you to come up with the
8  $6.66 per hour?
9      A.   I don't remember.
10     Q.   Can you tell me with any certainty
11 whatsoever how much you would make on a weekly
12 basis?
13     A.   Between $350 and $400.
14     Q.   Per week?
15     A.   Yes.
16     Q.   Was that consistent throughout the
17 entire time that you worked there?
18     A.   It varied.
19     Q.   Is that the best approximation that you
20 can give me?
21     A.   Yes.
22     Q.   How much did you bring home on a daily
23 basis?
24     A.   I don't remember.  I don't remember.
25     Q.   Give me an approximation.

Page 28

1      A.   Yes, 90, 80.  Less also.  It varied a
2  lot.
3      Q.   How about over $100 a day?
4      A.   Almost not.
5      Q.   Did it ever happen where you would make
6  over $100 a day?
7      A.   Once or twice, but it wasn't all of the
8  time.
9      Q.   Is it fair to say that the average you
10 would make would between 80 and 90 dollars a day?
11     A.   I think a little bit less, it's just
12 that it varied so I don't know.
13     Q.   Give me the range, if you can, is it a
14 fair range to say 75 to 90 a day?
15     A.   75.
16     Q.   So as low as 75 and as high as around
17 90?
18     A.   Yes.
19     Q.   It varied so there was no real way that
20 you could know how much you would make on a
21 particular day?
22     A.   No.
23     Q.   Did you file tax returns each and every
24 year?
25     A.   One year.

Page 29

1      Q.   You have only filed tax returns for one
2  year?
3      A.   Yes.
4      Q.   Let me mark this as Plaintiff's Exhibit
5  1.  I am going to hand you a document that was
6  produced to me in discovery and I am going to ask
7  you are these your tax returns or your tax filing
8  for the year 2013?
9      A.   Yes.
10          (Thereupon, the tax returns for 2013
11          was marked as Defendant's Exhibit Number 1
12          for identification.)
13     Q.   (By Mr. Leto) If you can turn with me
14 to page one of the tax return, but it's the third
15 page of that document.  On line twelve it talks
16 about your business income, and it states that you
17 earned $1,660 that year.
18          That's what it says, right?
19     A.   Yes.
20     Q.   According to you in 2013 you worked
21 basically 364 days at the car wash earning about 75
22 to $90 a day.
23     A.   Yes.
24     Q.   That number, those earnings that you
25 are saying that you earned, they are not reflected

Page 30

1   on this tax return, correct?
2       A.   I don't know.  I don't remember.
3       Q.   Well, you do remember how much you
4   earned in 2013, right?
5       A.   Yes, more or less, but I don't remember
6   much.
7       Q.   Was it more than $1,660?
8       A.   I think that.
9       Q.   Let's go back to the numbers you gave
10  me before.
11           You told me at least $75 a day, so in
12  about ten to 20 days you would have earned this
13  $1,660, right?
14      A.   Yes, it's just that year that's how I
15  prepared my taxes and because it varies I don't
16  remember very well.
17      Q.   Is it possible that you only earned
18  $1,660 in 2013?
19      A.   I don't remember.
20      Q.   In this document, if you go to the next
21  page, is that your signature on the bottom?
22      A.   This one?
23      Q.   Yes.
24      A.   That is my signature.
25      Q.   Above that it says, "under penalties of

Page 31

1   perjury, I declare that I have examined this return
2   and the accompanied schedule and statements and to
3   the best of my knowledge and belief they are true
4   correct and complete."
5           You signed below that line, correct?
6       A.   Yes, I did sign it.
7       Q.   Do you know what perjury means?
8       A.   If you would please explain.
9       Q.   I am just asking if you know what the
10  term means?
11      A.   No.
12      Q.   Perjury is making a false statement
13  under oath?
14      A.   Uh-hu.
15      Q.   Where you write that you made $1,660,
16  were you making a false statement in this tax
17  return?
18      A.   No.
19      Q.   So then this tax return is true and
20  accurate as to your earnings for the year 2013?
21      A.   It's correct.
22      Q.   You didn't file tax returns for 2014,
23  is that right?
24      A.   No.
25      Q.   Why not?

Page 32

1       A.   No, I didn't do it.
2       Q.   So you didn't report to the government
3   how much you earned at the car wash for the year
4   2014, 2015 or 2016?
5       A.   No, but I will do it.
6       Q.   I am just asking you if you have or
7   not?
8       A.   No.
9       Q.   When did you plan to do it?
10      A.   Later.
11      Q.   Like soon?
12      A.   Soon.
13      Q.   Who is your accountant?
14      A.   Cesar Bustillo, the one that made that
15  one.
16      Q.   You didn't file tax returns for 2012 or
17  2011 or 2010, correct?
18      A.   No, I only did that one.
19      Q.   Why did you do it this year?
20      A.   No.
21      Q.   Why did you do it in 2013?
22      A.   Simple, I just did it, that's it, but I
23  didn't do it the other years.
24      Q.   What led you to do it this year in
25  2013?

Page 33

1       A.   A cousin, my cousin.
2       Q.   So a cousin suggested that you file tax
3   returns?
4       A.   Because he did it also and he told me
5   to do it and I did, very simple.
6       Q.   Where it talks about your occupation on
7   this same page with your signature, it says that you
8   are self-employed.
9       A.   I worked at the car wash.
10      Q.   It doesn't say that in your occupation?
11      A.   But I worked at the car wash.
12      Q.   So that's not accurate?
13      A.   My signature is correct.
14      Q.   I understand that, but your occupation,
15  is that correct that you are self-employed?
16      A.   I don't know.
17      Q.   Did you tell your accountant that you
18  worked at the car wash?
19      A.   Yes.
20      Q.   Did you always receive a share of the
21  40 percent of the daily profits as your pay?
22      A.   Of the earnings?
23      Q.   Yes, was that always your rate of pay?
24      A.   Yes.
25      Q.   So the more efficient you were in your

Page 34

1 work the more you got paid, correct?
2      A.   Exactly.
3      Q.   Did you initially receive 50 percent of
4 the split per day?
5      A.   Exactly.
6      Q.   When did it change?
7      A.   Shortly afterward it was lowered to 40.
8      Q.   And then stayed at 40 percent until you
9 stopped working in 2016?
10     A.   Exactly.
11     Q.   Never lower than 40 percent?
12     A.   I don't remember, but it was 40.
13     Q.   Did you keep any records reflecting how
14 much you earned on a yearly basis?
15     A.   No.
16     Q.   Do you have a bank account?
17     A.   Yes.
18     Q.   Where?
19     A.   Bank of America.
20     Q.   How long have you had that account?
21     A.   I closed the account in 2014 and I have
22 the new one that I have now.
23     Q.   At Bank of America?
24     A.   Yes.
25     Q.   Have you had a Bank of America account

Page 35

1 since 2008?
2      A.   No.
3      Q.   When did you first open the Bank of
4 America account?
5      A.   I don't remember, but I do remember
6 that I closed it in 2014.
7      Q.   And then reopened another one?
8      A.   Yes.
9      Q.   Have you ever had an account at a
10 different bank?
11     A.   No.
12     Q.   Is your name the only name on the
13 account?
14     A.   Exactly.
15     Q.   Typically I want to understand how you
16 go about your day.  You receive the money after you
17 work at the car wash on a particular day, do you
18 then go and deposit that money in the bank?
19     A.   I almost never deposit it whole.
20     Q.   Some of the money you deposit?
21     A.   Some, not much, not all.
22     Q.   So just so I have it correct, say you
23 got your 75 dollars on Monday, you keep some of it
24 for yourself and put the rest into the bank?
25     A.   I almost never deposit it in the

Page 36

1 account, I kept it so it wouldn't be closed.
2      Q.   What branch of Bank of America do you
3 go to?
4      A.   The one which is the in the area where
5 I live.
6      Q.   Do you know the street address?
7      A.   36th and 13th.
8      Q.   36th Street and 13th Avenue?
9      A.   Yes.
10     Q.   Do you have an e-mail address?
11     A.   Yes.
12     Q.   Do you ever e-mail anybody related to
13 your work at the car wash?
14     A.   No.
15     Q.   You don't know Dagoberto's e-mail
16 address?
17     A.   No.
18     Q.   You never communicated with any of your
19 coworkers via e-mail?
20     A.   No.
21     Q.   And you didn't communicate with Alex
22 via e-mail, correct?
23     A.   No.
24     Q.   Just so I have it clear, Dagoberto
25 Freitas, he was the person that hired you and you

Page 37

1 reported to on a daily basis?
2      A.   Exactly.
3      Q.   Between the years 2008 and 2016, you
4 worked every single day except for Thanksgiving and
5 Christmas from 8:00 a.m. until 9:00 p.m.?
6      A.   Yes.
7      Q.   Without a single day off?
8      A.   No.
9      Q.   So I am correct when I say that?
10     A.   Yes.  Only Thanksgiving and after the
11 24th, is that the 25th, December.
12     Q.   Which would be Christmas?
13     A.   Only two days.
14     Q.   And you never called in sick once?
15     A.   Yes, but we wouldn't get the day.
16     Q.   You have tried to call in sick and they
17 said no you have to come in?
18     A.   Yes.  That's why I wouldn't even bother
19 because it was useless.
20     Q.   Why didn't you look for a new job if
21 those were the conditions that you were facing on a
22 daily basis?
23     A.   Because I just stayed there working.
24     Q.   How did you determine that you could
25 file a lawsuit against your employer for unpaid

Page 38

1  wages?
2      A.   Because they didn't pay overtime.
3      Q.   Has any of your other coworkers filed
4  the similar lawsuit in the past?
5      A.   No.
6      Q.   Have you ever filed a lawsuit before
7  other than this one, sir?
8      A.   No.
9      Q.   Have any of your family members, to
10  your knowledge, filed a lawsuit?
11      A.   No.
12      Q.   And Dagoberto Freitas was your
13  employer, correct?
14      A.   Yes.
15      Q.   Give me two minutes, I am just about
16  done.
17          Were any of your coworkers ever fired
18  from the car wash, were they fired by Dagoberto?
19      A.   Yes.
20      Q.   Alex never fired anybody that worked at
21  the car wash, right?
22      A.   No, Dagoberto did.
23      Q.   As far as determining how much you
24  received as far as payment is concerned, that was
25  all done by Dagoberto, correct?

Page 39

1      A.   Yes.
2          MR. LETO:  I have no further questions
3  at this time.  Thank you for your time today, sir,
4  it was a pleasure meeting you.
5                CROSS EXAMINATION
6  BY MR. TOBAK:
7      A.   I am going to ask you a couple
8  questions on the record.
9          Regarding Alex, we are going to call
10  him Alex, other than Alex asking you to push cars,
11  did he ever ask you to help him start some cars that
12  wouldn't start?
13      A.   No, start the cars, no, just to push
14  them.
15      Q.   What would happen if Alex asked you to
16  push a car and you didn't want to or didn't do it?
17          MR. LETO:  Object to form.
18      A.   Dagoberto would fire us.
19      Q.   (By Mr. Tobak) Dagoberto would fire you
20  if you didn't do what Alex said, is that correct?
21      A.   Yes, because you couldn't raise your
22  voice because you were out.
23      Q.   Would Alex ever make you stay late?
24      A.   Yes.
25      Q.   Explain to me, describe how that

Page 40

1  happened, when or why?
2      A.   Because after leaving work, after
3  finishing work Dagoberto would send us to move fish
4  tanks and furniture at the apartment of Alex.
5      Q.   How did you know it was Alex's
6  apartment?
7      A.   Because his wife was there, his cars,
8  everything.
9      Q.   Did you get paid for this?
10      A.   No.
11      Q.   If you didn't want to do it do you
12  believe that you would get fired?
13      A.   Yes.
14      Q.   Was this Alex that asked you to do
15  this?
16      A.   He would tell Dagoberto and he would
17  tell us.
18      Q.   So Alex would give direction to
19  Dagoberto and then Dagoberto would then tell you?
20      A.   Exactly.
21      Q.   Going back, earlier you said you bought
22  your own gloves, but originally the gloves were
23  given to you, is that correct?
24      A.   No.
25      Q.   They weren't given to you and then the

Page 41

1  money was taken out of the money that you earned?
2      A.   Yes, in the afternoon they would deduct
3  it because the shirt the uniform, the cap,
4  everything was deducted.
5      Q.   But who originally gave it to you?
6      A.   Dagoberto.
7          MR. TOBAK:  That's it for me.
8                REDIRECT EXAMINATION
9  BY MR. LETO:
10      Q.   On how many occasions between 2008 and
11  2016 did you move furniture?
12      A.   Many times, not all of the time.
13      Q.   More than five times?
14      A.   Yes.
15      Q.   More than ten times?
16      A.   No.  More than five, yes.
17      Q.   And it was always moving the furniture
18  at the same apartment?
19      A.   No.
20      Q.   So it wasn't always at Alex's apartment
21  that you were moving furniture?
22      A.   It's just from one place to another.
23      Q.   So you helped Alex move from one place
24  to another, is that correct?
25      A.   Yes.

Page 42

```
1        Q.   Those were the five to ten occasions
2   that you helped him move, correct?
3        A.   He would always ask us to move things,
4   always.
5        Q.   What were you asked to move?
6        A.   Fish tanks, furniture.  Or to unload
7   things, always.
8        Q.   And that was the five to ten times?
9        A.   Yes.
10       Q.   Where was Alex's apartment?
11       A.   Aventura.
12       Q.   It was an apartment or was it a house?
13       A.   A house.
14       Q.   Do you recall when these five to ten
15  occasions occurred?
16       A.   No, I don't remember.
17       Q.   Did you hear Alex tell Dagoberto to
18  have you move his stuff?
19       A.   Yes.
20       Q.   Do you know if Alex paid Dagoberto for
21  the work?
22       A.   I don't know.
23       Q.   So you don't know, it just turned out
24  that Dagoberto just didn't pay you?
25       A.   Yes.
```

Page 43

```
1        Q.   And the moving the furniture, that
2   wasn't part of your car wash work, right?
3        A.   No.  After we left work they would make
4   us do it.
5        Q.   How would they make you do it?
6        A.   Because if we didn't go we would get
7   fired.
8        Q.   Did Dagoberto tell you if you didn't do
9   it you would get fired?
10       A.   Exactly.
11       Q.   Alex never told you if you didn't do it
12  you would get fired?
13       A.   No, not Alex.
14       Q.   As far as the pushing of the cars,
15  going back to that real quick.  You said that
16  Dagoberto was the one that told you if you didn't
17  push it you would be fired?
18       A.   Yes.
19       Q.   Alex couldn't fire you because you
20  didn't work for him?
21       A.   I worked for Dagoberto.
22            MR. LETO:  Thank you very much, nothing
23  further.  I will order, please.
24  (The deposition was concluded at 2:20 p.m.)
25
```

Page 44

```
3            CERTIFICATE OF OATH
4   STATE OF FLORIDA
5
    COUNTY OF DADE
6
7       I, Adriadna Gonzalez-Rivas, Florida
8   Professional Reporter, Notary Public, State of
9   Florida, certify that LEONEL DONIS, personally
10  appeared before me on the 30th day of March, 2017
11  and was duly sworn.
12
13      Signed this 23rd day of April, 2017.
14
15
16      _____
        Adriadna Gonzalez-Rivas
17      Commission No: FF 173430
        Expires: November 29, 2018
```

Page 45

```
3            CERTIFICATE OF REPORTER
    STATE OF FLORIDA
4
    COUNTY OF DADE
5
6       I, Adriadna Gonzalez-Rivas, Florida
7   Professional Reporter, certify that I was authorized
8   to and did stenographically report the deposition of
9   LEONEL DONIS, pages 1 through 45; that a review of
10  the transcript was not requested; and that the
11  transcript is a true record of my stenographic
12  notes.
13
14      I further certify that I am not a relative,
15  employee, attorney, or counsel of any of the
16  parties, nor am I a relative or employee of any of
17  the parties' attorneys or counsel connected with the
18  action, nor am I financially interested in the
19  action.
20      Dated this  23rd day of April, 2017.
21
22      _____
23      Adriadna Gonzalez-Rivas
24      Florida Professional Reporter
```

**Exhibits**

**EX 0001 Leonel Donis 033017**
29:4,5,11

---

**$**

**$1,660**  29:17 30:7,13,18 31:15
**$100**  28:3,6
**$350**  27:13
**$400**  27:13
**$6.66**  25:22 26:21 27:8
**$75**  30:11
**$90**  29:22

---

**1**

**1**  29:5,11
**13th**  36:7,8
**151**  17:3
**169**  5:20 8:25
**17**  15:1,2,18

---

**2**

**20**  15:1,2,18 30:12
**2008**  5:8 9:2, 22,24 16:2 35:1 37:3 41:10
**2010**  32:17
**2011**  32:17
**2012**  32:16
**2013**  29:8,10, 20 30:4,18 31:20 32:21, 25
**2014**  31:22 32:4 34:21 35:6

---

**2015**  32:4
**2016**  16:2 17:7 32:4 34:9 37:3 41:11
**23**  8:24
**24**  8:2
**24th**  37:11
**25th**  16:7 37:11
**2:20**  43:24

---

**3**

**3/4/84**  5:4
**33rd**  5:20 9:1
**364**  29:21
**36th**  36:7,8

---

**4**

**40**  6:10 22:19 24:10,11,14 33:21 34:7,8, 11,12

---

**5**

**50**  34:3

---

**6**

**6.66**  25:15,18
**6:00**  10:23 15:24
**6th**  17:3

---

**7**

**72**  22:16,20, 22
**75**  28:14,15, 16 29:21 35:23

---

**8**

**80**  28:1,10
**8:00**  11:1,4 15:24,25 37:5

---

**9**

**90**  28:1,10, 14,17
**9:00**  11:3,4 15:25 24:8 37:5

---

**A**

**A&a**  3:24
**a.m.**  10:23 11:1,4 15:24, 25 37:5
**accompanied**  31:2
**account**  34:16,20,21, 25 35:4,9,13 36:1
**accountant**  32:13 33:17
**accurate**  31:20 33:12
**actual**  14:9
**address**  5:18, 22 6:4 9:1 10:12 17:2 36:6,10,16
**addressed**  5:25
**Adriadna**  3:1
**afternoon**  3:19,20 41:2
**afterward**  34:7
**Alex**  20:10, 11,15 21:3,6, 9,13,21,25 22:2,4,6

---

36:21 38:20 39:9,10,15, 20,23 40:4, 14,18 41:23 42:17,20 43:11,13,19
**Alex's**  40:5 41:20 42:10
**allowed**  27:7
**Alvaro**  7:6 8:8,9,13 26:1
**America**  34:19,23,25 35:4 36:2
**amount**  11:21
**and-a-half**  10:18
**Anthony**  6:8
**Antonio**  9:5
**apartment**  40:4,6 41:18, 20 42:10,12
**approximation**  27:19,25
**area**  20:24 21:1,3 23:20 36:4
**Arnaldo**  26:3
**arrived**  23:7, 11
**assume**  4:15
**attempt**  25:3
**Auto**  3:24
**Aventura**  42:11
**Avenue**  17:3 36:8
**average**  28:9
**aware**  20:20

---

**B**

**back**  16:13 18:4 30:9 40:21 43:15
**bank**  34:16, 19,23,25

35:3,10,18,24
36:2
**based** 11:20
**basically**
  29:21
**basis** 11:20
  13:19 18:15
  19:8 21:20
  22:13 24:24
  25:8,13 26:24
  27:2,7,12,23
  34:14 37:1,22
**begin** 9:20
**beginning**
  13:1
**belief** 31:3
**birth** 5:3
**bit** 28:11
**born** 5:5
**bother** 37:18
**bottom** 30:21
**bought** 40:21
**Brady** 17:20
  26:1
**branch** 36:2
**Brazil** 13:5
**break** 4:25
**bring** 27:22
**brother** 6:6
  7:1,12
**brother's** 6:7
**brother-in-law**
  8:10 18:3
**bus** 10:16,17
**business**
  29:16
**busses** 10:19
**Bustillo**
  32:14
**busy** 19:1
  20:1,3
**buy** 13:23,24
  14:1,2,17
**Byron** 26:2

---

**C**

---

**calculate**
  25:4
**calculated**
  25:17,22
**calculating**
  25:19
**calculation**
  26:5,17
**call** 37:16
  39:9
**called** 37:14
**cap** 41:3
**car** 9:14
  10:5,15,25
  11:20,23
  12:5,12,14
  13:2,8,15,20
  14:9,23
  16:20,25
  17:1,7,9,18,
  22 18:5,9,24
  20:2,21 21:10
  22:10,14
  23:22,23
  29:21 32:3
  33:9,11,18
  35:17 36:13
  38:18,21
  39:16 43:2
**Carias** 17:12
  26:1,2
**Carigas** 7:7
**Carmen** 7:6,22
**cars** 11:6,25
  12:6 18:22
  19:1,3,13,16,
  17,18,19,21
  20:5,9,12
  21:7,23
  39:10,11,13
  40:7 43:14
**case** 9:18
**cash** 25:9
**certainty**
  25:12 27:10

**Cesar** 32:14
**change** 34:6
**chemical**
  13:22 14:8,18
**Christmas**
  37:5,12
**citizen** 5:9
**claim** 4:7
**clean** 13:21
**clear** 4:22
  13:1 15:8
  18:18 19:13
  36:24
**close** 11:2
**closed** 34:21
  35:6 36:1
**communicate**
  36:21
**communicated**
  36:18
**company** 3:24
  6:20,23
**compensation**
  11:13,14
**complete** 31:4
**concerned**
  38:24
**concluded**
  43:24
**conditions**
  37:21
**conduct** 18:15
**consistent**
  27:16
**correct** 11:9
  22:4 23:23
  25:13 30:1
  31:4,5,21
  32:17 33:13,
  15 34:1 35:22
  36:22 37:9
  38:13,25
  39:20 40:23
  41:24 42:2
**cost** 12:1
  14:4

**couple** 4:5
  39:7
**court** 3:7,9
**cousin** 33:1,2
**coworkers**
  36:19 38:3,17
**CROSS** 39:5
**customer**
  13:3,9,12
  18:7
**customers**
  12:9,20

---

**D**

---

**Dagoberto**
  12:15,17
  13:4,14,16
  18:4,13 20:7,
  15,18,20,25
  21:5,12 22:1,
  3,5,10 23:10
  36:24 38:12,
  18,22,25
  39:18,19
  40:3,16,19
  41:6 42:17,
  20,24 43:8,
  16,21
**Dagoberto's**
  36:15
**Dagobeto**
  14:16
**daily** 11:20
  13:19 18:15
  21:20 25:8
  27:22 33:21
  37:1,22
**Danilo** 12:17,
  24 13:2,13,16
  18:4,13
  24:20,21
**date** 5:3
**daughter** 8:19
**day** 10:14
  11:2,5,25
  14:24 15:2,5
  16:2,5 19:10

22:25 23:3,7,
14,17 24:6,7,
12,15 25:1,2,
4,10 26:7
28:3,6,10,14,
21 29:22
30:11 34:4
35:16,17
37:4,7,15
**day-to-day**
11:18
**days** 15:8,10,
14,16,19,21,
23 16:9 23:24
24:3 29:21
30:12 37:13
**December** 16:8
37:11
**declare** 31:1
**deduct** 14:3,
18 41:2
**deducted** 41:4
**Defendant's**
29:11
**Del** 7:6,22
**depending**
12:9
**deposit**
35:18,19,20,
25
**deposition**
3:1 4:1,2
43:24
**describe**
39:25
**determine**
37:24
**determining**
38:23
**difference**
15:11,20
**DIRECT** 3:17
**direction**
40:18
**discovery**
29:6

**discussed**
11:13
**document**
29:5,15 30:20
**dollars** 28:10
35:23
**Donis** 3:14,22
6:8
**duly** 3:15
**duties** 12:3

---

### E

**e-mail** 36:10,
12,15,19,22
**earlier** 40:21
**early** 10:20
**earn** 22:13
**earned** 11:19
25:4,8,12
29:17,25
30:4,12,17
32:3 34:14
41:1
**earning** 26:23
27:1 29:21
**earnings**
29:24 31:20
33:22
**easy** 4:6
**Eddy** 17:12
**education**
9:6,10
**efficient**
33:25
**employees**
14:15,22
**employer**
37:25 38:13
**employment**
9:13
**end** 24:5,7
**entire** 10:8
12:4 13:7
18:6 27:17
**equipment**
13:18

**essentially**
12:19 14:4
**eventually**
13:4
**EXAMINATION**
3:17 39:5
41:8
**examined** 3:15
31:1
**Exhibit** 29:4,
11
**explain** 11:15
31:8 39:25
**exterior** 12:8

---

### F

**facing** 37:21
**fair** 28:9,14
**false** 31:12,
16
**family** 6:6
7:4,5 17:25
18:1 38:9
**father** 14:17
**Fernando**
17:12
**figure** 19:22
26:8
**file** 28:23
31:22 32:16
33:2 37:25
**filed** 3:24
29:1 38:3,6,
10
**filing** 29:7
**finishing**
40:3
**Fiorella** 3:6
**fire** 22:2
39:18,19
43:19
**fired** 17:6
25:24 26:6,15
38:17,18,20
40:12 43:7,9,
12,17

**fish** 40:3
42:6
**fixed** 11:17
**Florida** 3:2,3
**form** 39:17
**Freitas** 9:23
10:1 11:8,11,
15 12:17
36:25 38:12
**friend** 10:2,3
**friendly**
21:16
**full** 4:8 5:18
14:18
**fully** 4:16
**function**
12:22 18:8
**furniture**
40:4 41:11,
17,21 42:6
43:1

---

### G

**gas** 13:8
22:7,10 23:20
**gave** 24:22
30:9 41:5
**Giovanni**
17:20
**give** 3:10 4:8
27:20,25
28:13 38:15
40:18
**gloves** 13:21,
23 14:5 40:22
**Gonzalez-rivas**
3:2
**good** 3:19,20
21:12,14
**government**
32:2
**gross** 24:11
**ground** 4:5
**Guatemala** 5:6
9:9 16:13

guy 21:16

**H**

half 14:11,
 12,14,15,19
hand 29:5
happen 19:7,
 23 28:5 39:15
happened 40:1
happy 4:13
head 4:21
 23:2
hear 42:17
helped 41:23
 42:2
high 28:16
highest 9:6,9
hire 21:25
hired 9:23
 36:25
home 6:13
 26:12,13
 27:22
hour 10:18
 25:14,15,18
 26:21 27:4,8
hourly 25:23
hours 15:24
 22:16,19,21,
 23
house 42:12,
 13

**I**

idea 22:15
 24:25
identification
 29:12
illegally
 5:14
income 29:16
individuals
 12:18 13:10
 14:23 18:19

initially
 13:13 34:3
intake 12:19
 13:3,9
interior 6:13
 12:7,8 13:21
interiors
 18:23
Interpreter
 3:7
Isles 9:16,17
 17:8

**J**

jail 5:2
jar 24:17,21
job 12:3
 17:17 21:12,
 14 37:20
Jose 10:4
 18:11 26:1,3
July 17:7
Junior 12:17
 13:4,16 18:5,
 14

**K**

kind 25:17,19
knew 22:22
 23:2
knowledge
 22:6 31:3
 38:10

**L**

Large 3:4
late 39:23
lawsuit 3:25
 37:25 38:4,6,
 10
leave 10:20
 15:11
leaving 40:2

led 32:24
left 17:6
 23:18 43:3
Leonel 3:14,
 22
Leto 3:18,23
 29:13 39:2,17
 41:9 43:22
level 9:6,10
Lilian 7:6
 8:12
Liliana's 7:8
live 5:16 6:4
 7:3 8:21
 17:23,24
 23:20 36:5
lived 5:21
 6:1 8:25
lives 10:11
living 6:11
 7:16 8:4
 16:19
LLC 3:24
location 17:5
 21:7
long 5:21
 10:17 17:4
 34:20
lot 22:18
 25:20 28:2
low 28:16
lower 34:11
lowered 34:7

**M**

made 25:3,14,
 18 31:15
 32:14
make 4:6 12:7
 19:1,21 21:13
 24:23 25:1,2
 27:4,11 28:5,
 10,20 39:23
 43:3,5
making 27:6
 31:12,16

Maria 7:6,22
mark 29:4
marked 29:11
married 8:11
Matthew 3:23
meaning 4:11
means 19:12
 31:7,10
mechanic
 18:25
meet 10:1
 26:8
meeting 39:4
member 17:25
members 38:9
Miami 5:17
 16:15
Mine 26:14
Minor 6:8
minutes 5:1
 38:15
Mix 3:22 6:8
 7:7
Mobil 9:16
mobile 9:17,
 21 10:15 17:9
moment 20:4
Monday 35:23
money 35:16,
 18,20 41:1
morning 10:21
move 19:6
 40:3 41:11,23
 42:2,3,5,18
moved 9:1
moving 41:17,
 21 43:1
Munoz 26:3

**N**

names 12:16
needed 13:15
 21:23
niece 8:18,23

nodding  4:21
northeast
  16:24 17:1,3
Northwest
  5:20 9:1
Notary  3:3
November  16:8
number  10:13
  14:24 27:2
  29:11,24
numbers  30:9

**O**

oath  31:13
Object  39:17
occasions
  41:10 42:1,15
occupation
  33:6,10,14
occurred
  42:15
Octavio  26:2
October  9:22,
  24
older  7:11,25
open  10:25
  23:23 24:1,2,
  3 35:3
order  43:23
orders  13:17
originally
  40:22 41:5
overtime  38:2
owner  20:13
  22:7

**P**

p.m  11:3 24:8
p.m.  11:5
  15:24,25 37:5
  43:24
paid  11:16
  22:10 24:9
  25:9 34:1

40:9 42:20
paint  19:2
  21:1,3
painting
  20:23
Palencia
  17:20
part  43:2
partners
  20:16,17
past  38:4
pay  14:11,12,
  14,15,18
  20:18 22:4
  24:10 33:21,
  23 38:2 42:24
paycheck  14:3
paying  20:21
payment  38:24
penalties
  30:25
people  8:20,
  25 12:19
  15:18 18:14
  24:15
percent
  24:10,11,14
  33:21 34:3,8,
  11
percentage
  24:9
perform  12:22
  18:8 26:4
period  16:6
perjury  31:1,
  7,12
person  17:13
  36:25
personally
  23:21
phone  10:13
place  19:6
  20:1 41:22,23
Plaintiff's
  29:4
plan  32:9

pleasure  39:4
point  12:19
polish  12:7
polishing
  18:23
portion  12:1
position
  11:12
prepared
  30:15
Pride  3:24
problems  4:10
produced  29:6
production
  11:14
products
  13:22 14:8,10
Professional
  3:2
profits  33:21
property
  22:11
provided  4:16
Public  3:3
pull  20:5,6
purchased
  14:5,9
push  19:1,3,
  21 20:5,9,11
  21:7,23
  39:10,13,16
  43:17
pushing  19:18
  43:14
put  35:24

**Q**

question
  4:11,16,19
  27:5,6
questions
  4:7,9 39:2,8
quick  43:15

**R**

raining  23:22
rainy  23:24
  24:3
raise  39:21
range  28:13,
  14
rare  4:20
rate  33:23
real  28:19
  43:15
recall  42:14
receive  13:17
  18:17 33:20
  34:3 35:16
received
  11:21 12:1
  24:18,19
  38:24
record  3:21
  4:22 18:18
  39:8
records  25:7
  34:13
REDIRECT  41:8
reflected
  29:25
reflecting
  34:13
related  4:7
  36:12
relationship
  7:8,23 8:8,16
  18:2
remember  6:24
  7:11 27:9,24
  30:2,3,5,16,
  19 34:12 35:5
  42:16
remodeling
  6:12,13 7:13
Rene  7:6 26:1
rent  20:19,21
  22:10

```
reopened   35:7        service   18:7        state   3:3,21         30:1 31:16,
rephrase   4:12        set   11:8            statement            19,22 32:16
report   23:6           14:24 25:1           31:12,16            33:2
 32:2                  shaking   4:21        statements          taxes   30:15
reported               share   14:4          31:2               telling   15:13
 18:20 37:1             33:20                states   5:7,9,       25:23
reporter   3:2,        shine   12:7           12 6:2,16,25        ten   11:25
 8,9                   shirt   41:3           9:2,12 16:17         30:12 41:15
represent              shop   18:25           29:16               42:1,8,14
 3:23                   20:13                station   9:21       term   15:7
requires   4:19        Shortly   34:7         10:15 13:8           31:10
respect   13:15        sick   37:14,16        22:7,11 23:20      testified
 21:10                 sign   23:4           stay   39:23          3:16
rest   14:25            31:6                 stayed   34:8        testimony
 15:3,4,5,6,7,         signature             37:23                3:10
 17 35:24               30:21,24            stopped   16:3       Thanksgiving
Restaurant              33:7,13             34:9                 16:7 37:4,10
 7:19 8:5             signed   31:5          straight            thing   21:6
return   29:14         similar   38:4         16:10              things   42:3,7
 30:1 31:1,17,        simple   32:22         street   5:20       time   4:25
 19                     33:5                  9:1 36:6,8          5:23 10:8,21,
returns   28:23       single   15:2          Stuart   26:2        25 11:2 12:4,
 29:1,7,10             16:2,5,10            stuff   42:18         23 13:7 15:19
 31:22 32:16           37:4,7              suggested             16:12 18:6,9
 33:3                 sir   3:19 5:16        33:2                 20:4 21:7
Rios   17:20           9:7 38:7 39:3        suing   9:18          24:7 27:17
role   18:5           sister   7:9,         Sunday   18:11,       28:8 39:3
Romeli   3:22          10,15,17,24,          12,17               41:12
rules   4:5            25 8:1,11,21         Sundays   18:11      times   26:7
                      sister's   18:3       Sunny   9:16,17       41:12,13,15
───────────           sitting   25:11        17:8                42:8
      S               Sixth   9:11          swear   3:9          tip   24:17,21
───────────           slow   19:25          sworn   3:7,15      Tobak   39:6,19
salary   11:17        son's   12:15                              41:7
 25:1                 sons   12:16         ───────────          today   4:1,22
Sandoval              space   20:21              T               25:11 39:3
 10:4,5,11            Spanish   3:6        ───────────          told   8:20
 18:12,13,16          speak   12:13        talk   21:18,         11:15 18:14
 26:3                 split   24:14         20,22,23             20:8,25 21:6
schedule   11:8        34:4                talked   18:22        30:11 33:4
 31:2                 spoke   11:11        talking              43:11,16
self-employed          13:13               26:19,20            tools   13:19
 33:8,15              start   39:11,       talks   29:15        total   11:21
send   40:3            12,13                33:6                 15:1 24:11
senior   14:16        started   13:2,      tanks   40:4         travelled
 23:12                 6                    42:6                16:16,18
series   4:7                               tax   28:23
                                            29:1,7,10,14
```

trip  10:17
true  31:3,19
truth  3:10,11
truthful  4:17
turn  13:12
  29:13
turned  13:4
  42:23
twelve  29:15
types  13:19
Typically
  35:15

**U**

Uh-hu  31:14
understand
  4:11 15:12
  20:14 33:14
  35:15
understood
  4:16 22:9
uniform  41:3
United  5:7,9,
  12 6:1,16,25
  9:2,12 16:16
unload  42:6
unpaid  37:25
useless  37:19

**V**

varied  11:18
  24:25 27:18
  28:1,12,19
varies  30:15
vehicle  12:1
vehicles  12:9
verbally  4:20
Visa  5:11
voice  39:22

**W**

wage  25:23

wages  38:1
walk  21:13
Warger  3:6
wash  9:14
  10:6,25 12:5,
  6,13,14 13:2,
  8,20 14:24
  16:20,25
  17:1,7,9,18,
  22 18:5,9,24
  19:16 20:2,21
  21:10 22:10,
  14 23:23
  29:21 32:3
  33:9,11,18
  35:17 36:13
  38:18,21 43:2
washed  12:8
  19:17
washing  11:5
  14:9 18:22
  19:12,19
week  15:8,14,
  19,23 22:15
  25:5 27:14
weekly  19:7
  24:23 25:12
  26:24 27:1,7,
  11
whatsoever
  27:11
wife  40:7
Wilber  26:2
work  5:11
  6:18,20 10:5,
  7,8,14,21
  11:12 15:8,15
  16:24,25
  17:9,14
  18:15,20,24
  19:5 22:14,16
  23:3 34:1
  35:17 36:13
  40:2,3 42:21
  43:2,3,20
worked  7:12,
  20 8:6,13
  10:9 11:5,25

12:4,23 13:8
14:21,23
15:16,21,23
17:4,22 18:6,
9 20:24 21:1,
4 22:18,20,22
24:15 27:17
29:20 33:9,
11,18 37:4
38:20 43:21
workers  11:9
  14:1,5,21
working  9:20
  13:2,6 15:19
  16:3,15 23:22
  34:9 37:23
write  22:24
  23:1 26:17,18
  31:15
wrong  24:1

**Y**

Yamilet  7:7
  8:16,17,19
year  16:6,10
  28:24,25
  29:2,8,17
  30:14 31:20
  32:3,19,24
yearly  22:13
  26:24 34:14
years  5:23
  8:24 16:10
  32:23 37:3
younger  7:25
  8:2,3